**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-1373

_____

UNITED STATES OF AMERICA

v.

ELVIN WRENSFORD,

Appellant

_____

No. 16-1395

_____

UNITED STATES OF AMERICA

v.

CRAIG MULLER,

Appellant

_____

APPEAL FROM THE DISTRICT COURT
OF THE VIRGIN ISLANDS
(D.C. Nos. 1-13-cr-00003-001 & 1-13-cr-00003-002)

District Judge: Hon. Wilma A. Lewis

———————

Argued May 2, 2017

———————

Before: GREENAWAY, JR., SHWARTZ, and FUENTES,
Circuit Judges

(Filed: August 31, 2017)

Omodare B. Jupiter, Esq.  [ARGUED]
Federal Public Defender
1115 Strand Street, Suite 201
Christiansted, VI 00820

*Counsel for Appellant Elvin Wrensford*

Martial A. Webster, Sr., Esq. [ARGUED]
Law Office of Martial A. Webster, Sr.
116 Queen Cross Street
Frederiksted, VI 00851

*Counsel for Appellant Craig Muller*

Alphonso G. Andrews, Jr., Esq.
Rhonda Williams-Henry, Esq.  [ARGUED]
Office of United States Attorney
1108 King Street, Suite 201
Christiansted, VI 00820

David W. White [ARGUED]
Office of United States Attorney
5500 Veterans Drive, Suite 260
United States Courthouse
St. Thomas, VI 00802

*Counsel for Appellee United States of America*

_____

OPINION OF THE COURT

_____

SHWARTZ, <u>Circuit Judge</u>

Elvin Wrensford and Craig Muller ("Defendants") were convicted of federal and territorial crimes arising from a May 10, 2012 shooting in Christiansted, St. Croix. Defendants appeal the District Court's orders denying their motions to suppress evidence, the admission at trial of out-of-court identifications, orders denying their motions for mistrials based on the jury poll, and the refusal to give a voluntary manslaughter jury instruction.    Muller also challenges the sufficiency of the evidence against him.

Because Wrensford was de facto arrested when, without probable cause, he was transported from the location where police found him to a police station and placed in a cell, we will vacate and remand to the District Court to determine whether (1) an exception to the Fourth Amendment applies and renders the evidence admissible, or (2) a new trial is warranted.    As to Muller, we will affirm the District

Court's judgment because (1) he waived his challenge to the suppression rulings, (2) the District Court did not abuse its discretion by admitting the eyewitness identification, polling the jury and instructing it to redeliberate, or refusing to give a voluntary manslaughter jury instruction, and (3) the District Court correctly concluded that the evidence was sufficient to support the jury's verdict against him.

I

A

Wrensford and Muller were involved in an altercation with a man at Ben's Car Wash on the afternoon of May 10, 2012. A few hours later, the man returned to the car wash with Gilbert Hendricks, apparently looking for someone. Hendricks and the man left, but Hendricks returned to the car wash at around 8:00 p.m. Shortly after he arrived, a red truck passed in front of the car wash and, moments later, the truck turned around and chased Hendricks down the road toward Food Town, a local supermarket. The passenger, who was later identified as Wrensford, fired several shots at Hendricks. Hendricks died two days later from gunshot wounds to his head.

B[1]

Several officers responded to the scene at around 8:06 p.m. Witnesses told Officer Julio Mendez that a red truck left the area at a high speed. Mendez drove in the direction the truck was observed going, and 45 minutes later, he encountered two men walking on the road. Mendez stopped in front of them and noticed that both were sweating profusely; one said they were coming from a basketball court in the area. Mendez called for backup, and before he could approach them, both men ran. One ran into the bushes and the other ran toward a gas station. Mendez radioed a general description of the men to other officers.

Officer Leon Cruz was patrolling after the shooting when, at 8:46 p.m., he heard the transmission from Mendez stating that two "black, rasta males" were on the run. App. 358-59. (Cruz testified that "rasta" means a person who has dreadlocks. App. 428-29.) Cruz thereafter observed a man wearing a white shirt running across the street toward a ballpark. Cruz turned toward the ballpark and saw a "rasta guy" standing near the bush area. App. 362-63. He also saw a white shirt hanging in the bushes. At approximately 8:58 p.m., Cruz drew his gun, ordered the individual—Wrensford—to show his hands and get on the ground, and once another officer arrived, Cruz placed Wrensford in handcuffs. Cruz patted Wrensford down and removed a knife, keys to a GMC truck, a wallet, and an insurance card

---

[1] Because Wrensford's motion to suppress is central to this appeal, the facts in Section B are drawn largely from the evidence presented at the suppression hearing. Many of these facts were also presented at trial.

from Wrensford's pockets. Wrensford was then transported to the "C Command" police station in a police vehicle at around 9:06 p.m. and placed in a cell. Officers later returned to the area where Wrensford was stopped and recovered a Smith & Wesson 9 mm pistol close to where he had been standing. Shortly after Wrensford was detained, Mendez notified the other officers that a red GMC truck had been found, partially hidden in bushes, next to an abandoned building.

At the scene of the shooting, Detective Kirk Fieulleteau spoke to two witnesses: Tynicia Teague and her father, Trevor Teague, who were in the Food Town parking lot during the shooting and said they were able to identify the shooter. Fieulleteau decided to speak with the witnesses at C Command, so he asked a fellow officer, Lydia Figueroa, to take Wrensford from C Command to the Rainbow Building police station in Frederiksted. Fieulleteau went to the station and found Wrensford in a cell. Fieulleteau took Wrensford's driver's license and then he, Figueroa, and another officer escorted Wrensford outside while handcuffed and placed him in a police car in front of the station. Fieulleteau testified that he did not want the witnesses "to have any sort of inadvertent interaction with him." App. 659.

Tynicia and Trevor Teague arrived at C Command at around 9:55 p.m. As Wrensford was being taken out of the station and into the car, which was a few steps from the station's front door, Tynicia Teague was waiting at a traffic light outside the station. She looked toward C Command and observed Wrensford being put into the police car. The Teagues thereafter entered the police station and met with the police. Before Fieulleteau had formally commenced the interview with Tynicia Teague, she "blurted out" that she saw

the shooter, referring to Wrensford, being taken out of the station. App. 600. Trevor Teague told Officer Richard Matthews "the same thing." App. 661. Tynicia Teague then provided a statement concerning the shooting, and when shown Wrensford's driver's license, she confirmed that he was the shooter and the person she saw outside the station.

Matthews met with Wrensford later that night at Rainbow Building. At 12:23 a.m., Matthews read Wrensford his Miranda rights, and Wrensford acknowledged his rights but did not sign the Miranda waiver form. Wrensford told Matthews that he was playing basketball that evening in the Princess area with "a partner of his," but he declined to give his partner's name. App. 509. While being booked at approximately 1:30 a.m. on May 11, Wrensford agreed to provide a DNA sample.

Tynicia Teague also said she saw the truck's driver. Three days after the shooting, she was shown a photo array that included Muller's photo and she identified him as the driver. She said that prior to the shooting, she had seen Muller with Wrensford.

C

At trial, Muller's grandfather testified concerning Muller's actions and whereabouts after the shooting. Muller began staying with his grandfather on the fourth day after the shooting. Muller told his grandfather that he was ill, considered not going to work, and planned to travel to New York to see his mother and a doctor. Notably, two of his co-workers testified that Muller never mentioned that he was feeling ill or planning to leave St. Croix. Rather, one of

Muller's co-workers testified that he overheard co-workers asking Muller whether he was involved in the shooting (they heard that he was). Muller's supervisor testified that, after the shooting, Muller asked to be reassigned to work in a different area of the island, because "he had a situation." App. 1920-21.

Just four days after he began living with his grandfather, Muller left St. Croix and traveled to the San Juan, Puerto Rico airport, where he was met by Tomas Garcia, a Customs and Border Protection officer. Garcia testified that he approached Muller from behind and told him he was "there to pick him up." App. 1544. Muller "lowered his head and shoulders" and "said that's okay. I figured somebody was going to pick [me] up." App. 1544. Garcia handcuffed him and advised him that he would be detained "on some business that he had in St. Croix . . . ." App. 1544. Garcia escorted Muller to an inspection area and asked whether Muller knew of any issues or problems in St. Croix. Muller then "broke down crying," App. 1545, and returned to St. Croix.

D

Wrensford and Muller were charged with: (1) possession of a firearm in a school zone, in violation of 18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B) (Count I); (2) using a firearm during a violent crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count II); (3) first degree murder, in violation of 14 V.I. Code §§ 922(a)(1) and 923(a) (Count IV); and (4) unauthorized possession of a firearm, in violation of 14 V.I. Code § 2253(a) (Count V). In addition, Wrensford

was charged with possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count III).

Wrensford moved to suppress items found in his possession, the statements he made to law enforcement, identifications made by Tynicia and Trevor Teague, and his DNA sample. Muller moved to suppress any identification evidence. The District Court granted Wrensford's motion to suppress the truck keys, wallet, and insurance card, but denied his motion to suppress the knife, his statements to the police, the DNA evidence, and the eyewitness identifications. The District Court found the DNA sample was admissible because it was taken after he was arrested and pursuant to probable cause. As to the identifications of both Wrensford and Muller, the Court concluded that the identifications were not the product of unduly suggestive procedures and denied the motions to suppress them.

E

In addition to the events described above concerning the apprehension of Wrensford and Muller, the jury heard testimony from Henry Mason, who knew Wrensford, Muller, and Hendricks. Mason testified that he was at Ben's Car Wash on the afternoon of the shooting and observed Muller and Wrensford having an altercation with an associate of Hendricks.

Tynicia Teague testified that she was in the Food Town parking lot on the night of the shooting and went to the police station afterward, but claimed she did not remember any details about the shooting or her identification of Wrensford. Portions of her statements to the police, which

included her identifications of Wrensford and Muller, and the photo array were admitted into evidence.

The Government presented evidence that 9 mm, .38 class (9 mm), and .40 caliber bullet casings were found at the scene of the shooting or in the truck. The jury also heard evidence that a 9 mm Smith & Wesson was found where Wrensford was stopped, his DNA was found on the weapon, and the 9 mm casings found at the scene were fired from that gun.

F

After hearing the evidence, instructions, and summations, the jury found Wrensford guilty on Counts I-V and Muller guilty on Counts I, IV, and V. Defendants asked to poll the jury.

All jurors, including Juror 7, initially responded that the verdict was their independent verdict, but after Juror 7 replied regarding Count IV as to Wrensford, Wrensford's counsel stated that he did not hear a response. The Court asked again whether it was Juror 7's independent verdict, and she responded "Yes. Yes." App. 2506. Wrensford's counsel stated that he saw Juror 7 "shrug [ ] her shoulders" and heard no response to the question on Count IV and that he "barely heard a verbal response from her" as to Count III. App. 2506-07. Wrensford's counsel sought a declaration that the verdict was not unanimous or, in the alternative, that Juror 7 be repolled; Muller's counsel also said that he did not hear Juror 7 and that she should be repolled.

The District Court continued polling the remaining jurors on Count V as to Wrensford, without objection, to

which the jurors responded that it was their unanimous
verdict, and Juror 7 was then re-polled on Counts III and IV
as to Wrensford and the following ensued:

> The Clerk: Juror No. 7, we were unable
> to hear your response as to Count III. Is this
> your independent verdict?
> The Juror: Yes.
> The Clerk: As to Count IV, is this your
> independent verdict?
> The Juror: Yes.
> The Clerk: Yes? I can't hear you.
> The Juror: Yes.
> The Clerk: And that was as to Wrensford
> on both counts. Is this your independent
> verdict?
> The Juror: No.
> The Court: As to Wrensford? As to
> Count III?
> The Juror: No.
> The Court: As to Count IV?
> The Juror: No.

App. 2516. After a sidebar, the Court decided to continue
polling as to Muller, and defense counsel did not object. On
Count I as to Muller, Juror 7 stated that it was not her
independent verdict. The Court continued polling the
remaining jurors on that count without objection. After
asking counsel "whether we poll with respect to all the other
counts, or we determine, at this point, whether some other
course of action is appropriate," App. 2520, Muller and
Wrensford moved for mistrials on the grounds that there
would be too much pressure on Juror 7 if the jury were

directed to redeliberate. Muller also asked to continue polling as to the other counts. The District Court continued the poll and all jurors, including Juror 7, stated that those guilty verdicts against Muller (on Counts IV and V) were their independent verdicts.

Wrensford moved for a mistrial as to Counts III and IV and Muller moved for a mistrial as to all counts. In response, the District Court excused the jury to discuss with the parties whether it should deliver a jury instruction directing the jury to redeliberate on Counts III and IV for Wrensford and Count I for Muller. Defendants reiterated their positions and motions. The Court decided to have the jurors redeliberate on those counts and gave a supplemental instruction telling the jury, among other things, that it was desirable to reach a verdict but emphasizing that the jurors should not surrender their convictions and that the verdict must reflect the conscientious judgment of each juror.[2] After deliberating

---

[2] The District Court instructed the jury as follows:

Now, let me remind you of a couple of things as you go back for these further deliberations. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself. But do so only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced that your view is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. It is desirable if a verdict can be reached, but your verdict must reflect the conscientious judgment of each juror. Under no circumstances must any juror yield his conscientious judgment.

You're reminded also that the government bears the burden of proving each element of the offense beyond a reasonable doubt. Do not ever change your mind just because the other jurors see something differently, or just to get the case over with. As I've told you before, in the end your vote must be exactly that, your own vote. And as important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.

So with that, by way of supplemental instruction, I will ask that you return to the jury room and deliberate further on the particular counts that I have mentioned, that is Count I for Mr. Muller, which is Possession of a Firearm in a School Zone; and Counts III and IV for Mr. Wrensford, Possession of a Firearm with an

again, the jury returned a guilty verdict against Wrensford on Counts III and IV and against Muller on Count I. The jury was polled again, and all jurors, including Juror 7, replied "Yes," that it was their independent verdict, on all counts. App. 2566-70. Wrensford was thus convicted on Counts I-V, and Muller was convicted on Counts I, IV, and V.

Wrensford moved for a new trial, and Muller moved for a judgment of acquittal or a new trial. Defendants challenged the Court's pre-trial suppression orders, the evidentiary rulings made at trial that allowed out-of-court identifications into evidence, and the Court's refusal to declare a mistrial after a juror indicated that the verdict did not represent her individual verdict, and Muller asserted that the evidence was insufficient to convict him. The District Court denied these motions.

Wrensford and Muller appeal.

---

Obliterated Serial Number, is Count III, and Murder in the First Degree is Count IV, with the lesser included offense, Second Degree Murder, as part of Count IV as well.

So with that, I ask you to return to the jury room for further deliberations. Thank you.

App. 2562-63.

II[3]

A

Wrensford argues that the District Court erred in denying his motion to suppress because his involuntary transportation to the police station and detention in a cell constituted an arrest without probable cause, in violation of the Fourth Amendment.    We agree and conclude that Wrensford's transportation to C Command and placement in a cell was a de facto arrest.[4]

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV.    A "seizure" occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Florida v. Bostick, 501 U.S. 429, 437 (1991) (citation and internal quotation marks omitted).    Absent some exception, evidence obtained as a result of an illegal seizure,

_____

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231 and 48 U.S.C. § 1612(c).    We have jurisdiction pursuant to 28 U.S.C. § 1291.

[4] We "review[ ] the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[ ] plenary review of the District Court's application of the law to those facts." United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002) (citation omitted).

including evidence obtained by consent tainted by the illegal seizure, is inadmissible. See Florida v. Royer, 460 U.S. 491, 507-08 (1983).

Depending on the facts, involuntary transportation to a police station or other custodial setting can be deemed a de facto arrest. See Hayes v. Florida, 470 U.S. 811, 816 (1985) (holding that an illegal arrest occurred when the defendant was transported, without probable cause, from his home to the police station for fingerprinting, and that "the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes"); Royer, 460 U.S. at 494-95, 504-07 (plurality opinion) (holding that the defendant had been subjected to an illegal arrest when, after detectives requested and did not return his airline ticket and driver's license, he was asked to come with the officers from the concourse into an "interrogation room" approximately 40 feet away, where his suitcases were searched); Dunaway v. New York, 442 U.S. 200, 207, 212, 216 (1979) (concluding that the police violated the Fourth Amendment when, without probable cause, they seized the defendant from a neighbor's home and transported him to the police station for interrogation without telling him he was free to go); Davis v. Mississippi, 394 U.S. 721, 724-28 (1969) (ruling that an unreasonable seizure occurred when police brought the defendant to the police station without probable cause, a warrant, or his consent for fingerprinting and brief questioning before he was released); see also Kaupp v. Texas, 538 U.S. 626, 631-33 (2003) (per curiam) (holding that police executed an illegal arrest when they took a teenage suspect from his home and brought him, in handcuffs, to the police

station for questioning); <u>Deputy v. Taylor</u>, 19 F.3d 1485, 1491 (3d Cir. 1994) (discussing <u>Dunaway</u>'s holding "that the 'reasonable suspicion' which permits a limited stop under <u>Terry v. Ohio</u> . . . is not enough to allow the police to transport the person stopped to the police station and extract information through detention and interrogation" (citation omitted)).

Other appellate courts have also concluded that transportation to and detention in a police station or other custodial setting constitutes a de facto arrest. <u>See, e.g.</u>, <u>United States v. Acosta-Colon</u>, 157 F.3d 9, 15 (1st Cir. 1998) (holding that, under <u>Royer</u>, the defendant was arrested when "he was prevented from boarding his plane, placed in handcuffs, involuntarily transported (in restraints) to an official holding area some distance from the place of the original stop, confined to a small interrogation room and kept there under observation for more than a momentary period; yet he was never informed how long he would be detained nor told that he was not under arrest"); <u>Centanni v. Eight Unknown Officers</u>, 15 F.3d 587, 589, 591-92 (6th Cir. 1994) (holding that taking an individual who was not suspected of any crime to a police station and into an interview room, and detaining her for approximately four hours where it was made clear she was not free to leave, violated the Fourth Amendment); <u>United States v. Obasa</u>, 15 F.3d 603, 608 (6th Cir. 1994) (ruling that an illegal arrest occurred when officers stopped a cab in which the defendant was riding on an interstate highway, read him his <u>Miranda</u> rights, and brought him to an airport police station in a police cruiser, and noting that "[w]hile [the defendant] was not taken from his home to the police station, he was taken 'forcibly' from a public place where he had a right to be"); <u>United States v. Ceballos</u>, 812

F.2d 42, 45-46, 48-50 (2d Cir. 1987) (stating that an illegal arrest occurred when the defendant was asked to accompany agents to a field office, the agents did not convey that he had a choice in the matter, and he was then placed "in a small, locked interview room" and questioned for several hours); United States v. Martinez, 808 F.2d 1050, 1055 (5th Cir. 1987) (stating that "[t]he removal of the suspect from the scene of the stop to police headquarters usually marks the point at which an investigative stop becomes a de facto arrest," but concluding that the officer had probable cause at the time he transported the defendant to the station); United States v. Gonzalez, 763 F.2d 1127, 1128, 1133 (10th Cir. 1985) (holding that having the defendant follow an officer to a police station "three to four miles away," after the officer had asked for and retained the defendant's driver's license, registration, and title was not permissible as part of a Terry stop, and stating that "we understand the Hayes decision as eliminating the option of forcing the suspect to go to the police station from the alternatives available to the officer during an investigative detention"); United States v. Moreno, 742 F.2d 532, 534, 535-36 (9th Cir. 1984) (holding that escorting the defendant from a baggage claim area to a DEA office approximately 75 yards away was an arrest, and that his consent to the search of his bag in that office was tainted by the illegal seizure). Not every transportation by police, however, constitutes an arrest. See United States v. McCargo, 464 F.3d 192, 197-99 (2d Cir. 2006) (concluding that officers acted reasonably in transporting the defendant in a police car from the location he was apprehended, which was approximately 200 feet from the crime scene, back to the crime scene for potential identification by the victim).

There is no doubt that Wrensford was subjected to a de facto arrest when the police transported him from the place he was stopped to the police station and placed him in a cell. Upon finding him near the ballpark approximately one hour after the shooting, Cruz drew his gun, ordered Wrensford to show his hands, ordered him to the ground, and placed him in handcuffs. After Cruz patted him down and removed his knife, keys, wallet, and insurance card, Wrensford was placed in a police car and transported to C Command. Wrensford was never told he was free to leave or that he did not have to come to the station. Once at the station, Wrensford was placed in a cell. Wrensford was then taken from C Command to Rainbow Building where he was formally arrested at 1:30 a.m. The "line" between an investigative stop and a de facto arrest was certainly "crossed" when the police forcibly removed Wrensford from a place he was entitled to be and transported him to the police station and detained him in a cell, and, under the precedent, could have been crossed even before he was placed in the cell. Hayes, 470 U.S. at 816. Put simply, the involuntary transportation to the police station and placement in a custodial setting thereafter constituted a de facto arrest. Dunaway, 442 U.S. at 216. We need not decide at exactly which point along the timeline here Wrensford was de facto arrested because on these facts, it is clear that he was subjected to a de facto arrest once he was put in a cell.

The Government argues that transporting and detaining Wrensford was not a de facto arrest, and probable cause was not required, because detaining him was reasonably necessary to continue an active investigation into the shooting. Certain investigatory seizures are permissible under the Fourth Amendment if there is a reasonable, articulable suspicion that a person has committed or is about

to commit a crime. <u>Terry v. Ohio</u>, 392 U.S. 1, 21, 27 (1968). In addition, "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention . . . ." <u>Royer</u>, 460 U.S. at 504.    The record, however, does not indicate that Wrensford was moved from the street and detained in a cell out of a concern for the officers' or the public's safety or security.    Rather, as Cruz testified, Wrensford was taken to C Command for investigation and, specifically, to verify whether Wrensford was the same person who fled from Mendez and to allow the case agent, Matthews, to question him.

Because Wrensford was arrested when he was taken to C Command and placed in a custodial setting, and the Government concedes that the officers did not have probable cause to arrest Wrensford at that time, we next consider whether the evidence obtained following the de facto arrest must be suppressed.

The police recovered several things after the de facto arrest: Tynicia Teague's identifications of Wrensford, as well as Wrensford's license, a statement, and DNA sample. This evidence must be suppressed unless the Government can demonstrate an exception to the Fourth Amendment's requirements such as the independent source, inevitable discovery, or attenuation doctrines, or the good faith exception.    <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590, 604 (1975) ("[T]he burden of showing admissibility rests, of course, on the prosecution."); <u>United States v. Pellulo</u>, 173 F.3d 131, 136 (3d Cir. 1999) (collecting cases).    Because the District Court found the detention proper, it did not determine whether any exception applied, including whether there were

"intervening events [that] broke the connection" between
Wrensford's illegal arrest, on the one hand, and Tynicia
Teague's statement and identification, Wrensford's statement,
and his DNA sample, on the other hand  Dunaway, 442 U.S.
at 219.[5]  Because we do not have the benefit of the District
Court's view on whether any exception to the Fourth
Amendment's requirements applies to the challenged
evidence, we will remand to the District Court for it to
examine whether the evidence gathered after the de facto
arrest is subject to such an exception and hence is admissible.

For these reasons, we will remand to the District Court
to determine whether the evidence gathered following the de
facto arrest is admissible.  See Kaupp, 538 U.S. at 633
(stating that the defendant's confession must be suppressed
"[u]nless, on remand, the State can point to testimony
undisclosed on the record before us, and weighty enough to
carry the State's burden" to show there was "'any meaningful
intervening event' between the illegal arrest and [defendant's]
confession" (quoting Taylor v. Alabama, 457 U.S. 687, 691
(1982)); cf. United States v. Coward, 296 F.3d 176, 180-83
(3d Cir. 2002) (where the Government asked to reopen before
our Court, remanding to the district court to evaluate whether
the Government should be permitted to reopen the

---

[5] To make a determination on potential intervening
events, courts may consider, among other things, whether the
evidence was "obtained by exploitation of an illegal arrest,"
the "temporal proximity between the arrest and" collection of
the evidence, "the presence of intervening circumstances, and
particularly, the purpose and flagrancy of the official
misconduct . . . ." Brown, 422 U.S. at 603-04.

suppression hearing).[6]  If the evidence obtained was not subject to an exception to the Fourth Amendment's requirements, then it is inadmissible. Royer, 460 U.S. at 507-08; Brown, 422 U.S. at 603-05.  If the evidence is deemed inadmissible, then the District Court must determine whether its admission was nevertheless harmless beyond a reasonable doubt. United States v. Schaefer, 691 F.2d 639, 644 (3d Cir. 1982).  If the District Court deems the evidence inadmissible and determines that its admission was not harmless beyond a

---

[6] Whether the Government will be permitted to reopen the suppression hearing following remand to offer evidence will be subject to the District Court's discretion and will require consideration of, among other things, whether Wrensford will be prejudiced.  Whether a defendant will be prejudiced depends on whether he will have an opportunity to respond and rebut the evidence. Coward, 296 F.3d at 181 (quoting United States v. Blankenship, 775 F.2d 735, 741 (6th Cir. 1985)).  Courts also consider the timeliness of the motion to reopen, the nature of the evidence, the reason why the evidence was not initially presented, and whether the timing of its presentation will distort its importance. Id. (quoting Blankenship, 775 F.2d at 741).  As to the reasons for the failure to present the evidence, courts may consider how the new evidence came to light and whether the law was unsettled or unclear at the time of the initial proceedings. Id. at 182.  Reopening may also be permitted to allow the presentation of evidence about a technical matter "overlooked by inadvertence." Id. (citation and quotation marks omitted). In Coward, our Court concluded that the district court should evaluate the Government's reasons for seeking to reopen, including whether it provides a "reasonable and adequate explanation for its failure to present" evidence. Id.

reasonable doubt, then it should grant Wrensford a new trial. Otherwise, it shall reinstate the verdict.[7]

As to Muller, however, we reach a different conclusion. Muller presented no argument that the District Court erred in denying Wrensford's motion to suppress or that the District Court abused its discretion in admitting the eyewitness identifications, but rather "adopt[ed] and incorporate[ed] by reference all four . . . arguments made by Appellant Wrensford in his brief." Appellant Muller's Br. 42. Although there are circumstances where a party may adopt the arguments of a co-party in a consolidated case, see Fed. R. App. P. 28(i), Muller specifically disclaimed at oral argument reliance on an argument that Tynicia Teague's identification was the fruit of the poisonous tree, Oral Arg. Recording at 17:15-18:33, available at http://www2.ca3.uscourts.gov/oralargument/audio/16-1373USAv.Wrensford.mp3. Moreover, the arguments Wrensford made have nothing to do with Muller. Indeed, Tynicia Teague's identification of Muller arose from different facts and involves applying some different legal principles from those applicable to her identification of Wrensford. Thus, Muller cannot pursue his appeal of the suppression ruling against him by adopting Wrensford's suppression arguments.

---

[7] Because we are remanding and the findings on remand may impact the admissibility of Tynicia Teague's out-of-court identification, we need not address Wrensford's argument that the District Court erred in admitting her out-of-court identification.

B

We next consider whether the District Court erred in denying the motions for mistrials based on non-unanimous jury verdicts. We review a district court's actions concerning jury polling for abuse of discretion. <u>Virgin Islands v. Hercules</u>, 875 F.2d 414, 417 (3d Cir. 1989). Our Court has adopted "a rule vesting discretion in the trial court" because "a trial judge is in the best position to weigh the circumstances peculiar to each trial and determine whether a poll coerced a juror into acquiescing in the majority's demands." <u>United States v. Fiorilla</u>, 850 F.2d 172, 176 (3d Cir. 1988).

A jury verdict in a federal criminal trial must be unanimous. Fed. R. Crim. P. 31(a); <u>United States v. Scalzitti</u>, 578 F.2d 507, 512 (3d Cir. 1978). A defendant has the right to poll the jury after it returns its verdict, and if the poll reflects a lack of unanimity, a district court may direct the jury to redeliberate or may declare a mistrial. Fed. R. Crim. P. 31(d); <u>Hercules</u>, 875 F.2d at 417-18 & n.6. Specifically, Rule 31(d) of the Federal Rules of Criminal Procedure provides:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Fed. R. Crim. P. 31(d). We consider several factors to determine whether the method of polling and redeliberation

created an impermissibly coercive environment for the dissenting juror(s).   Those factors include: (1) whether counsel objected to continued polling after a juror voiced disagreement with the verdict; (2) whether the trial involves multiple counts and/or multiple defendants; (3) the nature of the court's supplemental instruction, if any; and (4) any evidence showing that the dissenting juror's will may have been overborne.  See Fiorilla, 850 F.2d at 176-77; see also United States v. Aimone, 715 F.2d 822, 832 (3d Cir. 1983) (addressing specific challenges to a jury poll).

A consideration of these factors shows that the District Court did not abuse its discretion in continuing to poll and in instructing the jury to continue deliberating.  First, the record shows that Defendants moved for a mistrial when polling showed a lack of unanimity, but did not object to further polling when Juror 7 dissented.  Once Wrensford's counsel said he did not hear Juror 7 respond when she was polled on Count IV and that he barely heard her respond on Count III, counsel for both Defendants requested she be repolled.  The Court continued polling on Count V without objection and then returned to Counts III and IV, and Juror 7 responded that those verdicts were not her independent verdicts.  The Court then, without objection, polled the jurors with respect to Muller, including all jurors on Count I.  Both Defendants moved for mistrials, but Muller then requested that polling continue as to the other counts—and on those Counts, IV and V, all jurors reported that the verdicts were their independent verdicts.  Thus, although polling revealed Juror 7 as the lone dissenter, and Defendants argued for mistrials and asserted that Juror 7 would be subjected to a coercive atmosphere if the jury were sent back to deliberate, they did not object to the continued polling.  Because Defendants failed to object to

the continued polling, their silence deprived the District Court of an opportunity to consider their views about continuing the poll, and thus we are hard-pressed to say that the District Court abused its discretion when it had no objection to rule upon.

Second, this case involved two defendants who were each tried for multiple counts. The District Court justifiably had an interest in continuing to poll as to all counts to obtain at least a partial verdict. Indeed, it is appropriate to repoll a jury to attempt "to take partial verdicts wherever possible in a relatively complex, multi-count, multi-defendant criminal prosecution." Fiorilla, 850 F.2d at 177. Thus, we do not fault the District Court for confirming unanimity as to any and all counts.

Third, in its instruction to the jury before it recommenced its deliberations, the District Court told the jury that reaching a verdict is desirable, reminded the jurors that their verdict "must reflect the conscientious judgment of each juror," and said that "[u]nder no circumstances must any juror yield his conscientious judgment." App. 2562-63. These warnings "removed any possibility that the supplemental charge could be considered [ ] coercive." United States v. Brennan, 326 F.3d 176, 193 (3d Cir. 2003); see also Fiorilla, 850 F.2d at 176-77 (noting that "[b]efore deliberations resumed the next day, the trial judge delivered a cautionary instruction asking the jurors to carefully weigh and consider the views of their fellow jurors"); cf. Lowenfield v. Phelps, 484 U.S. 231, 234-35, 241 (1988) (concluding that there was no coercion when the jury was sent back to deliberate as to sentencing, where the district court provided a cautionary instruction after one juror answered in the negative to the

court's question whether further deliberations would enable each juror to arrive at a verdict). The instruction, therefore, served to prevent coercion.

Fourth, there is no evidence that Juror 7's will was overborne during redeliberation such that she was coerced into agreeing with the guilty verdicts on Counts III and IV for Wrensford and Count I for Muller. The record does not show any doubt on her part when the court polled the jury after redeliberation.

Considering these factors together, we conclude that the District Court did not abuse its discretion in polling, reinstructing the jury, and having the jury redeliberate. Thus, the motions for mistrials were properly denied.

## C

We next address the assertion that the District Court erred in refusing to give a voluntary manslaughter jury instruction.

We review a district court's refusal to give a certain jury instruction for abuse of discretion. Virgin Islands v. Isaac, 50 F.3d 1175, 1180 (3d Cir. 1995). A court acts within its discretion in declining to give an instruction where the requested instruction lacks "rational support in the evidence." Bishop v. Mazurkiewicz, 634 F.2d 724, 725 (3d Cir. 1980). Moreover, the Constitution does not "require a jury instruction on lesser included offenses where the evidence does not support it." Id.

Here, Defendants asked the District Court to provide a voluntary manslaughter instruction. Voluntary manslaughter under Virgin Islands law requires proof that: (1) the defendant unlawfully killed another; (2) the defendant did so without malice aforethought; (3) the killing occurred "upon a sudden quarrel or in the heat of passion"; and (4) the defendant had done the act "either with an intent to kill or an intent to inflict serious or grievous bodily injury that would likely cause or result in death." Isaac, 50 F.3d at 1179; see also Virgin Islands v. Knight, 764 F. Supp. 1042, 1049 (D. V.I. 1991) (listing the same elements); 14 V.I. Code Ann. § 924 (defining voluntary manslaughter).

The evidence does not support a voluntary manslaughter instruction in this case. Crucially, that offense requires proof that the defendant killed upon a sudden quarrel or in the heat of passion. Isaac, 50 F.3d at 1179. Witnesses testified that an altercation between Wrensford and Hendricks's associate occurred hours before the shooting, and Muller attempts to suggest that this provoked the shooting but does so without any evidentiary basis. As a result, there was no "rational support" in the record for a necessary element of voluntary manslaughter, Bishop, 634 F.2d at 725, and hence, the District Court did not abuse its discretion in refusing to give the voluntary manslaughter instruction.

## D

Finally, we turn to Muller's argument that there was insufficient evidence to support his convictions for possession of a firearm in a school zone (Count I), first degree murder (Count IV), and unauthorized possession of a firearm (Count V). He argues that the evidence was insufficient to find that

he "had anything to do with the death of Gilbert Hendricks, Jr." and insufficient "to convict [him] on any count." Appellant Muller's Br. 32, 37. In other words, he advances a theory of misidentification and not the insufficiency of the evidence as to any particular element or count. Thus, we review the record to determine whether there is sufficient evidence to show his involvement in the shooting.

Our review of the sufficiency of the evidence is "highly deferential." United States v. Caraballo-Rodriguez, 726 F.3d 418, 430 (3d Cir. 2013). "We do not weigh evidence or determine the credibility of witnesses in making this determination." United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003) (citation omitted). Rather, we view the evidence as a whole and "ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." Caraballo-Rodriguez, 726 F.3d at 430 (citation and internal quotation marks omitted); see also United States v. Sparrow, 371 F.3d 851, 852 (3d Cir. 2004) (stating that we examine the "totality of the evidence, both direct and circumstantial" and credit "all available inferences in favor of the government" (citation and internal quotation marks omitted)).

The evidence here was sufficient to prove Muller's role in Hendricks's murder. First, Mason testified that Muller was at Ben's Car Wash on the afternoon of May 10, where he became involved in an altercation with an associate of Hendricks. Second, Tynicia Teague viewed a photo array and identified Muller as the driver of the truck from which the

shooter shot Hendricks.[8]    Although she did not identify
Muller in court and claimed not to remember any of the
details of the shooting, and she testified only to witnessing a
shooting at Food Town involving men in a red truck, she
authenticated her May 13 statement and photo array
identifying Muller as "[t]he guy . . . driving the red truck
Thursday night, May 10, 2012, during the shooting incident
in front of Food Town grocery," Muller Supp. App. 2, and

---

[8] Muller makes a passing reference to the District
Court's admission of eyewitness testimony offered against
him, but this is insufficient to avoid waiving the challenge,
see Free Speech Coal., Inc. v. Att'y Gen. of U.S., 677 F.3d
519, 545 (3d Cir. 2012). Even if Muller did not waive this
argument, it fails because the procedures employed with
respect to the photo array were not unduly suggestive.
Tynicia Teague had seen Muller several times in the past and
identified him as the truck's driver from a six-photo array
during an interview with police at a restaurant on May 13,
2012.    As Defendants' expert in the field of cognitive
psychology, memory, and eyewitness identification testified
at trial, the photo array contained "five additional
photographs that were similar in appearance to Mr. Muller.
And that's the proper procedure for conducting an
identification." App. 2272.    These procedures were not
unduly suggestive, and the District Court did not err in
admitting Tynicia Teague's identification of Muller. See,
e.g., United States v. Burnett, 773 F.3d 122, 133-34 (3d Cir.
2014) (holding that a photo array in which "all of the men in
the array were of similar age; there was no striking difference
in the amount of head hair each had; and the skin color of the
members of the array was not strikingly different" was not
impermissibly suggestive).

both were admitted as substantive evidence, see Fed. R. Evid. 801(d)(1)(C); United States v. Brink, 39 F.3d 419, 425-26 (3d Cir. 1994). The jury also heard that, at various times prior to the shooting, Tynicia Teague had seen Muller with the shooter. Third, Muller provided inconsistent stories to his co-workers and grandfather in the wake of the shooting. Muller asked to stay with his grandfather after the shooting and told his grandfather he was feeling ill and that he planned to see a doctor in New York. However, over those same days he did not inform his supervisors of any medical issues and did not tell them that he planned to leave St. Croix. Fourth, when met by Customs and Border Patrol agents in the San Juan airport, Muller "lowered his head and shoulders" and "said that's okay. I figured somebody was going to pick [me] up," App. 1544, and, when asked whether he knew about any issues pending in St. Croix, Muller "broke down crying," App. 1545, suggesting a consciousness of guilt. Based upon the witnesses who placed him with the shooter on the day of the shooting and at other times, Tynicia Teague's identification of him as the driver of the truck from which the shooter shot Hendricks, and his conduct after the shooting, there was sufficient evidence from which a rational trier of fact could find that Muller was involved in the shooting of Hendricks and thus sufficient evidence existed to support his convictions.[9]

---

[9] Muller also argues that he should be granted a new trial because the verdict is contrary to the evidence, the verdict was less than unanimous, and justice requires a new trial. Federal Rule of Criminal Procedure 33(a) provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review the denial of a motion for a new trial pursuant to Rule

III

For the foregoing reasons, with respect to Wrensford, we will vacate and remand for the District Court to determine whether the identification, Wrensford's statements, and the DNA evidence obtained following his de facto arrest are admissible.  We will affirm the District Court's other rulings, including the judgment against Muller.

---

33 for abuse of discretion.  United States v. Silveus, 542 F.3d 993, 1005 (3d Cir. 2008).  "Such motions are not favored and should be granted sparingly and only in exceptional cases." Id. (citation and internal quotation marks omitted).  For the reasons stated herein, Muller has not established any basis for a new trial.  We will therefore affirm the District Court's denial of his motion for a new trial.